The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Ladies and gentlemen, this is the time for the hearing on bank and business in the United States. And we understand the counselor here, we regret the delay, but we had a crowded courtroom just a little while ago. So counsel, the appellant may proceed. Thank you, your honors. Jean Rosenbluth for the government. I will be addressing the criminal law related issues, and Assistant United States Attorney Lawrence Cole will address the naturalization issues. Your honors, this is a complicated case with a long history, so I'd like to begin by going over what this court need not consider in this en banc rehearing. All three members of the original panel that heard this case found that the district court erred when it resentenced defendant Hovsepian pursuant to a writ of audita querela and Rule 35. Defendant Hovsepian did not raise that issue in his petition for rehearing. He never challenged that finding. Therefore, this court need not reconsider whether Hovsepian's resentencing was illegal. It was. Assuming that his resentencing was illegal, there is no basis for the sealing order that the district court entered in this case as to defendant Hovsepian. And let me explain why. When the district court resentenced Hovsepian, she resentenced him pursuant to the Federal Youth Corrections Act. He was originally sentenced as an adult. The district court relied on a provision, Section 5021 of the FYCA, that allows if the district court sentences the defendant to probation and that probation is terminated early, to quote-unquote set aside the conviction and issue a certificate to that effect. That was the only basis upon which the district court had any arguable authority to seal the records as to Hovsepian. This court has already held in the Sumner case, which the defendants have never challenged, and which is in accord with every other circuit to have considered this issue, that a district court has no inherent or ancillary jurisdiction to seal records absent some sort of illegal arrest, which we don't have here, or other constitutional violation. So the sealing order as to Hovsepian also cannot stand. If the sealing order as to Hovsepian cannot stand, then his naturalization cannot stand as well, because critical information that this court has deemed to be highly relevant was omitted from the record before the district court when it naturalized Mr. Hovsepian, and Mr. Cole will address that further. But all that would mean, that wouldn't answer any of the questions having to do with jurisdiction or who was to sign the naturalization. It would simply vacate the result and send it back to the district court to reconsider with this information, if we thought that the jurisdiction before the district court was otherwise proper. That's correct, Your Honor. Okay. That brings us to Mr. Yacoubian. The government never objected to Mr. Yacoubian's resentencing under the FYCA, because at the time he was originally sentenced, the district court neglected to make the necessary finding that he would not benefit from an FYCA sentence. So the only question criminal law related as to Mr. Yacoubian is whether the set-aside provision of the FYCA authorized the district court to seal all of the records relating to Mr. Yacoubian. The set-aside provision says simply this, that when probation is terminated early, the conviction shall be set aside and a certificate issued to that effect. It says nothing about arrest records. It says nothing about expungements. It says nothing about sealing. So the question here is whether those two words, set-aside, means sealing. Or permit sealing. That's different. Well, no, because what the statute says is that when probation is terminated early, the set-aside, the conviction shall automatically be set aside. So one could argue that if you follow the plain language of the statute, there would be no discretion not to seal the records if we, Your Honor, interpret set-aside to mean sealing, because the statute does say automatically. I urge Your Honors to look very carefully at the First Circuit's opinion in Doe. It was cited in the government's opening brief, but it was not referenced in the government's answer to the petition for rehearing. The cite is 732F2-229. That case is very important for several reasons. In it, the panel, which included then Judge and now Justice Breyer, exhaustively examined the legislative history of the FYCA and concluded that there is no basis for sealing records under it, as the majority of the courts that have looked at this have concluded. I think what's most critical about that opinion is footnote 4. In footnote 4, after going through the legislative history at length, the Doe court notes that after the Doe v. Webster opinion that the defendants rely on came out, the Federal Public Defender's Office went to Congress with a bill that would have specifically amended the Federal Youth Corrections Act to make Doe v. Webster the law, to allow for expungement and sealing of records. And Congress said, no, we're not going to do that. This is much more than simply a failure to act that this Court and the Supreme Court have routinely said doesn't have all that much significance. It's an affirmative refusal to interpret the FYCA the way that the defendants would have this Court do it. And why is it different? Well, because there are several cases in this Court and in the Ninth Circuit where the courts have said simply saying that Congress hasn't done something once a case came out. I'm going to ask you, how is this different? Because here there was an actual bill that was introduced. And it didn't pass. That's exactly what usually happens in the cases where something didn't happen. Well, it's not exactly the same, because in those – you're right, that something – that the language didn't pass in both of the situations. And there's always this ambiguity about whether it didn't pass because they already thought it was there or it didn't pass because they didn't want it. And there's all kinds of cases saying that. You can't tell, and therefore you just don't put much in it. Well, the government would beg to differ, because here it's not just that Congress didn't act, that they read this case and never introduced a bill, never considered it. That would be just a sort of passive failure to act. Here a bill was introduced that included – that was based on Doe v. Webster, the case that the defendants rely on, that would have done exactly what Doe v. Webster held and Congress refused to pass it. Do you need to win on this point to prevail on the naturalization piece of the case? No, for several reasons, some of which Mr. Cole will address, but one of which I would like to address and is another thing that is very significant about the Doe decision. And that is the dissent in the panel in this case mentioned and relied heavily on another First Circuit decision, Mestre Morea, and said that Mestre Morea does not allow deportation based on a set-aside conviction. Well, the Doe case that I'm referring your honors to came out after Mestre Morea and discusses Mestre Morea and says that Mestre Morea has no impact on its decision that convictions that are set aside cannot be sealed. The other reason why it doesn't – it doesn't – I'm sorry, Your Honor. Excuse me. If you could – I want to be sure that I'm understanding this correctly. So the government's position is that naturalization is improper because good moral character can't be shown by reason of confinement for more than 180 days. Is that the section F7 that's being relied on, or is it some other subpart of that? Well, there's a case called Santa Maria Ames, which says that convictions, even if they fall outside – That's not my question. What statute is the government relying on in the naturalization piece to say a specific argument against naturalization? I think that would be something that Mr. Cole is more familiar with than I am. I'm not 100 percent sure on the answer to that, but perhaps he can answer Your Honor's question. But I would like to go back to Mestre Morea because there is a critical difference between this situation and Mestre Morea and Matter of Zingas and every other decision that has held that a set-aside conviction cannot form the basis for deportation. And that is that in this case, there have always been two grounds to deport these defendants. There has been the fact that they were convicted of a felony under the 1990 Act, and that was made expressly retroactive. But there has also been always, and it was alleged in the notices to appear, that these defendants engaged in terrorist activity. Congress considered terrorism so serious that it decided not to require a conviction. So there is a separate and independent basis here to deport these defendants, unlike in Mestre Morea, unlike in Matter of Zingas. And this court, Your Honor, Judge Nelson, in the Paredes case, specifically held that even if a set-aside conviction cannot form a basis for deportation, it can be considered in the deportation process to determine the equivalence of deportation. Right now, we don't have any deportation process before us, right? That's exactly correct because the defendants have done everything for 15 years to prevent it. So it's very helpful in trying to explain to us what it is we need to decide, but why at this juncture where we have people who right now have been naturalized as United States citizens and the question is whether that's a proper determination, do we have to decide anything about whether they could or would be deported? Well, certainly, because for the reasons that I addressed up front, especially as with Defendant Kosepian, the record that was before the district court at the time of naturalization, because it improperly kept out critical evidence. All right. But that's a different question. In other words, it may be that these convictions should have been introduced as part of the naturalization proceeding, but that's a different question from whether they were deportable, isn't it? Certainly. So, therefore, the specific reasons that were alleged for deportation and whether they were valid, mandatory, permissive, or anything else really are not our problem right now. Is that right? Well, I was responding to the dissent in the panel opinion, which based quite a lot of discussion and time on the Mr. Maria opinion. I agree with Your Honor 100 percent that the issue of whether these defendants are deportable on the basis of a set-aside conviction is not before this court, and it hasn't yet been decided by the Ninth Circuit. What is before us is whether it was introducible and should have been allowed to be introduced in the naturalization proceeding before the district court, assuming that naturalization proceeding was a valid proceeding. That's correct. One other thing that I'd like to point out that the Doe Court makes clear about the set-aside provision is that it sort of debunks this notion that is in the two cases that the defendants rely on, that it's not significant that the statute didn't use the term expungement because that term was not in currency at the time that the FYC was enacted. But what the Doe v. Webster Court points out in a footnote for another purpose is that the word sealing was in currency at that time. There were several state statutes and federal statutes relating to juveniles where courts expressly said that records could be sealed, and yet this provision says nothing about sealing, nothing whatsoever. And finally, another basis upon which the sealing order in this case cannot stand as to either defendant is that it's too broad. Even the two cases that the defendants rely upon don't allow for the sealing of arrest records. And although the order in this case doesn't specifically say arrest records, it says something broader. It says that the district court, I'm sorry, that the government and any agency were prohibited from using all information and materials relating to the documents that were the subject of this case. So this order is illegal, also on the ground that it prohibits arrest. And I would note that these defendants have always acted with the assumption that the order covered arrests. Defendant Hosepian, in his answering brief on appeal on page 2, says that the order covers arrests. The defendants refused to answer specific questions in the naturalization proceeding that pertained only to their arrests. And when that was pointed out to the district court, the district court didn't make them answer these questions. So the defendants and the court have always acted under the assumption that it covered arrests. Were they asked those questions in the district court proceeding? I don't believe they were asked them specifically in the district court proceeding. They were asked them by the INS, and they refused to answer. Was there an opportunity in the district court proceeding to ask those questions? Again, Mr. Cole was there and will be able to answer that question. I believe that it was the government's position, and I think it perhaps was litigated before the hearing that the sealing order would prevent that. It brings me to the last point that I'd like to discuss before I turn it over to Mr. Cole, which is the injunction that the district court entered ordering the government to treat defendants even according to the rule as they existed in 1985. Congress clearly intended in 1252G to prevent exactly the sort of molasses that we have here when it said that district courts and, I'm sorry, defendants could not interfere by filing causes of action or claims interfering with a decision by the INS to commence proceedings. The defendants claimed that 1252G doesn't apply because their settled expectations at the time that they were sentenced under St. Cyr were disrupted when the two bases for deportation were made retroactive in 1990. They acknowledged that Congress expressly made those bases retroactive, but they claimed that Congress didn't consider the impact of a JRAD on defendants who had received one. That argument borders on frivolous, frankly, because the very same act that made the two bases of deportation retroactive also retroactively eliminated JRADs. Wait a minute. Retroactively eliminated ones that already existed? It said that JRADs are ineffective as to conviction for crimes committed before, on, or after the date of the enactment of the act. But in any event, a JRAD only ever covered crimes relating to moral turpitude. By its expressed provisions, Congress only ever gave district courts authority to issue JRADs for crimes of moral turpitude. It never covered any other crimes. There's a century of Supreme Court case law saying that Congress can make new bases of deportation and make them retroactive, and that law existed at the time these defendants were sentenced. Did the government object to the JRAD at the time? Oh, certainly. And we had a lawyer from the INS at the sentencing to argue against it. We objected vociferously. Unless Your Honors have any further questions, I'll turn it over. I do have a question going back to the expungement. What do you do with the Hidalgo case and the Kammerdeiner cases, as opposed to the Campbell case, which was much earlier? It's the government's position that Kammerdeiner and Hidalgo are incorrectly decided, but frankly, also that they are a red herring. They're really not what's at issue here, because the question is not necessarily whether the set-aside provision is an expungement provision. Nobody here has ever argued, and in fact, I believe there's case law that says that even when convictions are expunged, it doesn't necessarily mean that the records are sealed always, and sometimes they can be used for certain purposes. The only question here is whether the terminology set aside encompasses sealing records. This Court doesn't need to address Kammerdeiner and Hidalgo. It's really we're not dealing with sentencing guidelines or recidivists here. But the district judge made it very clear that the records could be used for a criminal investigation, did it not? Did the district court? It did. All right. It did. And he said you think that Hidalgo and Kammerdeiner were wrongly decided. Well, whether or not they were wrongly decided, we must follow them. Well, no, this Court doesn't need to, in fact. Now that we've gone en banc, that argument is a stronger argument. But you can say set them aside and follow Campbell if we assume that they all deal with the same issue. And I would note that to the extent Kammerdeiner and Hidalgo are even relevant, every other circuit that's considered the question has held against them. But we're the Ninth Circuit. That's true. All right. Thank you, Your Honors. Thank you. Your Honors, the district court abused its discretion in not utilizing the avenue it had available to it to remand to INS to carry out the strongly expressed preference of Congress that administrative remedies be exhausted. And so I'd like you to assume for the purpose of my question that the district court had jurisdiction and just look at the merits of what it did. What is the basis in your view for a conclusion that these individuals could not demonstrate good moral character? Before responding to that, Your Honor, I first want to point out although the court did make a finding to that effect, this was not a proceeding under 1421C. This was not a proceeding where INS had at first made a decision and then the district court was reviewing the underlying merits of the decision. Of course, there had not yet been a decision, so the court proceeded to reach that. But assuming that the sealing order is put aside, then the court should have looked at the conduct that the defendants engaged in and taken that into account under Santa Maria Ames. It was highly relevant to determining whether or not they had good moral character during the time period. Did either or both of these individuals, I should know the answer to this question, but I don't. Did either of them spend more than 180 days in confinement as a result of conviction? Yes, I believe they both spent several years in confinement. Okay. There's a specific statute that says a person shall not be deemed to have good moral character if they've spent more than 180 days in confinement as a result of a conviction. And I guess my question to both sides is, in view of that, what difference does it make if the constitutional, at the time, conviction is later expunged or set aside or anything else when the focus seems to be on the fact that they were confined in prison? I think that's a good point, Your Honor. It would again demonstrate a reason that the district court abused its discretion in acting as it did and should have instead remanded to INS to allow it to go forward, reach a decision, and to take those issues into account rather than barring them improperly as it did. But is there such a provision that's applicable here? This is what I thought the lay of the land is, and maybe you can help me. I thought that there was a five-year period within which any conviction would be relevant. Then there was the permission to also take other behavior, including other convictions, into account, but that's not mandatory. Is that the right general lay of the land with regard to the naturalization in particular? I believe that's correct, although of course this Court has pointed out that the conduct outside the period is highly relevant. Right, but this 180-day statute doesn't apply to this, does it? Frankly, I think that the statute, which is Section 1427 of Title VIII, and specifically 1427A refers to good moral character, and as the Court is pointing out, it's the moral character during the relevant period, but the statute 1427E, I believe, allows the Attorney General, INS, to look back at conduct occurring prior to that. I believe the specifics that the Court's referring to may be found in INS regulations as opposed to in the statute. I know that INS has promulgated regulations discussing a good moral character. For instance, I believe if someone's committed homicide, that at least now is considered something that automatically would render them not to have good morals. So I think when we're looking at what Congress intended, we focus on the statute. Can I ask another question? Can we get an answer to Judge Berzon's question? I'm sorry, Your Honor. I thought that I— In other words, Judge Graber and I seem to have a different view, and I have absolutely no confidence in mine regarding whether the— I have before me HCFR 36.10, which seems to be the definition of good moral character for purposes of naturalization. It doesn't say anything about a 180-day incarceration period. Therefore, am I correct in assuming that it doesn't apply because it's outside the five-year period, although other things could be taken into account? Or am I incorrect in that regard? The regulation does not apply? No, that there's no 180-day incarceration mandatory requirement here. I believe that's correct. I believe the regulation that the Court is referring to, that Your Honor is pointing out, does not have a provision such as that there. And furthermore, in looking at good moral character, it's important to distinguish naturalization from removal or deportation. In deportation, certain convictions cause someone to be removable. In naturalization, the inquiry is different. It's whether someone's of good moral character. An arrest that didn't lead to a conviction could be taken into account. Conduct that didn't even end up being prosecuted could be taken into account. Because of the privilege that's being bestowed, the inquiry is more searching, and also the burden is therefore placed on the alien to prove his in all respects. I have another question. Is the government now comfortable with the notion that there is no pending removal proceeding which would preclude the naturalization? In other words, at one point you were arguing that there was a pending removal proceeding, that that was a reason why there couldn't be naturalization. Is that no longer your argument? The government is not arguing, has not argued in the briefs, that the removal proceedings are pending. The government argued that but for the improper preclusion of the use of the information and action by INS by the injunction of the sealing order, the government certainly would have gone forward with the removal proceedings, but it was barred from doing so. So that's not a reason for providing an abuse of discretion in a district court? The reason would have to be something rather improper. We're not arguing that. 1429 barred the district court from proceeding, and therefore it could not proceed. What's the difference in the district court's role with the 120-day provision in reviewing a determination based on an application? The district court, although it in a sense is stepping into the shoes of the INS, Congress, it's important to remember, the statute and the regulations are different here. The statute that Congress wrote said if there's not a determination within 120 days of the examination, it may apply to a court. INS went farther in its regulations and said it will decide within 120 days of the initial interview. By using the word examination, which 1446 defines, to include a bunch of things, not just the interview, Congress showed that it really intended INS to complete the whole process. You're very good at what you do, but could we get an answer to my question just as beginning, and then if you want to articulate, you can. What is the difference between the role of the district court when it's dealing with the 120-day provision as opposed to reviewing an INS determination of eligibility for naturalization? I'm sorry, Your Honor. I was prefacing that by saying the difference is I'm not interested for the moment in your preface. I want an answer to my question. The difference is complete the sentence. INS does investigation, background check, interviews the applicant. The court would just be reviewing the record created during that process. What is the difference in terms of the role and authority and review function of the district court? Isn't it de novo in both instances, in essence? It's de novo in the sense that it's not. It's certainly de novo in the 120-day instance, isn't it? No decision's been rendered. Because nothing's happened. Okay. Let's assume the INS has ruled. They deny naturalization. You go to district court. It's de novo, isn't it? Correct. Then it's de novo. Now we're down to my question. What's the difference? The court is reviewing the record created by INS and then determining whether to remand to INS and allow INS to decide where to go ahead and make the decision itself. If the court's question is substantively, is the court applying different standards or somehow acting differently, I think no, it's not different. Why do you say that it's reviewing the record made by the INS? I thought the statute allowed the district court to make its own findings and take additional evidence anyway. Your Honor, before I answer that, I just wanted to note we wanted to reserve five minutes of time and we're about to have about that left in rebuttal, but let me respond to the court's question. Section 1421 says that when INS has made a decision, the court shall conduct a hearing, assuming exhaustion is carried out, and can conduct a de novo hearing, which would indicate the court could take evidence and conduct a de novo proceeding. But in Section 1447B, all the court is doing there is reviewing a record. It's somewhat analogous to review under the APA. The court is acting from a de novo point of view on the merits in the sense that it doesn't have to give deference. Well, there's no decision from INS, so there's nothing to give deference to. But that's different from conducting a de novo proceeding where it's the fact finder. That's the distinction. The court isn't finding facts under 1447B. Well, in both cases it refers to a hearing, though. So you think the hearing is just to hear oral argument like we're doing today and not a hearing as a district court normally conducts a hearing? Yes, like a summary judgment. The record is made and the court is simply determining why. Other than wanting it to be so, what's your basis in the statutory text for having that view of hearing? The contrast, two things. One is the fact that 1447B refers to a determination on the matter under 1446. And 1446 refers to INS going through a whole process of background investigation, interview, reviewing the application, and all those things. So the district court is then making a determination. And 1446 says INS does steps one through three and then makes a determination. The district court is just stepping in at that last step. I have one quick question. Why would the statute authorize the district courts to remand cases back to the INS if the INS retained jurisdiction anyway? Because the district court might have a number of reasons to try to manage what's going on at the INS. The district court might find that it would want to put deadlines on the INS to act within a certain period of time as a spur to action, to tell the INS to complete a particular task if it wasn't done. Many functions could be served by remand even if the INS continued to retain jurisdiction. You have about two minutes left. Well, I will, unless there are further questions, I'll sit down and reserve the rest of the time for rebuttal. Thank you. May it please the Court. I'm Michael Lightfoot. I represent Mr. Kuby, and I'm going to argue all the matters except the last one, the St. Cyr issue, the JRAD issue that was raised in the petition for en banc review. If I could begin by answering the question, Judge Hawkins, that you put to Mr. Cole. The way the process works is that once an applicant files an application for citizenship, the first real time limit in the statute is in 1447B, and that says that after the interview, within 100 days, 120 days of the interview, the INS officer hasn't come down with a decision, then the applicant has a choice to make. You can wait, have that officer grant or deny it, if there's a denial. You actually get a review to what they call an immigration officer who does another hearing. If that officer grants it, then you get naturalized. If that officer, the second crack inside the INS, denies it, then under 1421C, every applicant who's been denied inside the service then has the right to take the case to district court and get under the statute and the regulations a full-blown de novo hearing. The Congress has made the decision that if there's been a delay between the interview and the termination, they give the applicant the opportunity to file an application with the district court under 1447B, and once you do that, then Congress says, and this is 1447B language, the court, quote, has jurisdiction. All that is is an acceleration by the applicant of the process. Because if the applicant wanted to have two cracks inside the agency and then wait to see what happened, the applicant would know that eventually you'd go before the district court and the district court would hold a full hearing. In this instance, the applicants decided to avail themselves of the early opportunity to accelerate the full de novo hearing before the district court. Counsel, what happens if the INS grants the application for naturalization after the applicant has filed the petition in the district court? Is the INS without jurisdiction so that the grant of naturalization is null and void? I would say in theory the INS does not have jurisdiction. Well, then let me ask how you reconcile that answer with our decision in C, S-Z-E, I suppose it's pronounced C, versus INS. In that case, precisely what I described happened on quite a number of applicants, and we held that therefore their action, they wanted to file a class action. We held that the whole thing was moot because the INS had granted their naturalizations. Now, if you were correct and the INS was without jurisdiction to act, then it would not have been moot because it would have been a null and void act by the INS. So we would have had to proceed. It seems to me we can't reconcile C with the position you've taken. Your Honor, this is a 1447B case. C was a mandamus action by a class group of individuals, and the discussion, the analysis by the panel was clearly one that dealt with whether or not this was a proper mandamus action, whether it met. They don't go off on the standard of review. They go off on mootness. But in the context of mandamus, Your Honor, and I fully admit here, even though the Court wouldn't have jurisdiction, if after we had invoked the Court's jurisdiction, the INS had granted their applications, we would have gone to the Court and probably asked the Court to remand. We would have asked the Court to exercise, you know, the option that it has in the 1447B. Also, in C, they weren't trying to get the district court to decide anything. In other words, they were not arguing that the district court should assert jurisdiction over the merits. They were there trying to speed up the INS, basically. In our case, Your Honor? No. In C, yes, Your Honor. Yes, Your Honor. So it wasn't at all clear that the kind of action that was was actually a 1447 action to begin with. It was not. And, you know, in this case, I would say that, you know, the government still takes the position that there was concurrent jurisdiction between the INS and the Court after we filed the application under 1447B, and that the Court abused its discretion in not sending it back to the INS. But as the dissent points out so clearly, and as we argued, you know, in our brief, there was not concurrent jurisdiction. There was sole jurisdiction in the Court. But even if, even if we acceded to the notion that the Court, this, the district court had to exercise some discretion, in this case, the facts show that there was such delay and there was a potential for more delay, then the Court certainly wouldn't have abused its discretion. First of all. Let me ask you about that delay. When I looked at the INS decision, it looked as though the Hovsepian was accorded a preliminary interview and scheduled after a continuance he obtained for February 2. He didn't show up. Then his lawyer asked for a rescheduling on April 21 for May 6. May 6, he showed up, but his lawyer didn't show up, and he said he didn't want to proceed with his examination outside the presence of his lawyer. Then he was scheduled for May 13. His lawyer called May 12 and said he wouldn't show up May 13 and wanted a continuance. He was rescheduled May 25. The lawyer said he wouldn't be able to keep the appointment. He needed a continuance. It seems to me that this went on and on until finally, instead of appearing for the interview on May 27, he sent a notary statement that didn't answer the critical questions, are you now involved with any sort of terroristic activities. He has consistently and contemporarily, not just decades ago, refused to disclose whether he has any engagement in terrorism. And he delayed his interview. Well, I don't represent Dr. Hosepian, Your Honor. I represent Mr. Yakubian, but I don't think that's a fair recitation of the facts. I was reading it from the INS decision, actually. But let me focus the question for you on something that applies to all three. Under your theory, as I understand it, if the applicant for naturalization wishes to, he can stall for 120 days, and then when the INS has not acted because of the continuances that the applicant has obtained and the applicant's failures to appear, the applicant can then get his naturalization heard by the district court and not the INS. No, I don't agree. Why not? I don't agree with that. How do you avoid that conclusion? And neither of the two applicants stalled here, Your Honor. We filed our applications on August 7, 1997. As Judge Nelson pointed out in dissent, there's normally a seven-month wait before interview. Here there was a 17-month wait. Dr. Hosepian, not my client, went to court and asked the judge to accelerate the interview because none had taken place within a year. Judge Felser, on September the 28th, 1998, ordered that the two of them be interviewed within 60 days. They both went down for interviews in Laguna Niguel over an hour from where they lived, and they were told the INS was not ready. They were then set for interviews on January the 15th. They showed up. That was more than 180 days. Counsel, your presentation of the facts, the INS presentation of the facts, lay the responsibility for the delays differently, of course. But I want to ask you, as a doctrinal matter, doesn't the contention that you make lead to the conclusion that if the applicant is, and you can make it hypothetically if you like, if the applicant is responsible for the 120-day delay, nevertheless he can get his naturalization determined by the district court rather than the INS? I would not agree to that at all, Your Honor. Why not? How do you avoid the conclusion? Because there are provisions in the regulations where, if that happens, the immigration authority can get an extension of 120 days, and they didn't do that here. Which regulation are you relying on? I think it's 333. I could tell the court later I think it's 333, but that wasn't done here. And you have to get a written acknowledgment from the applicant at that point. But, Your Honor, I would make the point that they violated Judge Felser's order when they didn't interview these two within 60 days. And then when they interviewed Mr. Yacoubian on the 15th, and the panel decision and the government brief, even in response to our petition for en banc, claims that Mr. Yacoubian didn't answer questions put to him. That is just not true. Well, I have a question about the merits of the case. And that has to do with the effect of a conviction that let us assume it's been expunged for the sake of our discussion. We have a couple of cases in the deportation context that say that a conviction that's been expunged, under state law at least, is still a conviction for purposes of analyzing deportability. And why wouldn't a conviction that has been expunged, nonetheless be relevant to a determination of whether a person has good moral character? Because the act occurred, whatever it was. And it seems to me that there's a particular logic behind saying we're going to pretend that the act never occurred and looking at the person's moral character. Well, Your Honor, first of all, this is not a deportation case. I know that. That's what I'm saying. But I'm asking you why, analogously, we could say it doesn't matter that it's been expunged. It's still relevant. Let me see if I can answer that. Your Honor, we agreed. The hearing took place before Judge Felzer on November 4, 1999. The government and both applicants actually stipulated to the eight issues that were in dispute and put them to the court and in the excerpts of record. The one that deals with good moral character is, do they meet the good moral character requirement under 1427E of Title VIII? And that is this test, Your Honor. You say you go back five years before the date of the application. The date of the application was August 7, 1997. Five years. Based on what do you go back five years? On the statute, Your Honor. Okay. Which statute tells you five years? 1427. You go back five years. And then you come forward to the date of the hearing. So the question is, what is their good moral, what is their character between August 7, 1992 and November 4, 1999? But then the statute also says that the Attorney General can take into account any period, anything that happened before that. Anything that happened before that is relevant. That's my question exactly. But there are cases in every circuit, and as Ms. Rosenbluth indicated, in the Ninth Circuit it's Santa Maria Ames v. INS, which says the court which is holding the hearing under 1447B of 1421C can hear evidence about misconduct before that five-year period. But if that's all the INS has, they have nothing to indicate other than rehabilitation during the five years that are in question, then that prior conduct can never be dispositive. Now, in this case, there was never an attempt made, and we briefed this ad nauseam, but there was never an attempt made by the government to introduce any evidence relating to the 1982 conduct. And we actually, we cited to the hearing where Judge Felser turned to the government. We said it goes back 17 years. It's relevant. It's minimally irrelevant. So is it your assertion that the conduct was not serious enough that makes it no longer relevant? I mean, if someone had gone in and killed eight people in a mall, presumably it would still be relevant 17 years later. So what exactly is relevant? Because this circuit has said that if it precedes that five-year date and there's been total rehabilitation and reformation during the five-year period, and if you look at my client from 1982 to 1999 when this hearing took place, I mean, he – But what's the logic of that? I mean, this is an end-bank court. We don't have to follow that case. My question is why shouldn't the court or whoever is doing, whoever has fiction, why shouldn't they be able to look at a conviction and the fact that it's a five-year conviction, even if it's more than five years and even if it's expunged? Because the key to this is the character during the five-year period. And case law throughout this country, federal case law, has said that prior conduct can certainly inform that decision. On a technical matter, it seemed to me that you did take the position in briefs in the district court that this material would be referred to. The government took that position before the judge. You argued in your briefs that that wasn't really a preclusion, but it certainly seemed like a preclusion. And the – I'm sorry? No, I think you're wrong. All right. The district court therefore – she regarded it as off-limits. Therefore, it's a determination of the kind that you're talking about. So, I mean, isn't it a technical question whether if – – or that it was a misbelief – – back to the district court for her to determine what to do on a relevant basis – – that it was sealed. But the technical answer – She knew about it, but she thought she couldn't use it. I don't think – the government – – and at page 162 of – – she asked Mr. Yakubian. She asked him if he had been arrested. Yes. He said yes. Had he been convicted? Yes. He said yes. And if you look – and we, in our records, we actually – – that, you know, she wrote in on the 15th, 1999. And she indicated that he said that he had been convicted. He went to prison. And his conviction was exposed. So it all got in. Counsel, I wonder if – – both have in the record that isn't really solved here. I'm looking at page four zeroes and then one zero in the excerpts. Exhibit five, Yakubian's affidavit. Hosepian's is identical. The question is, are you now or have you ever been – – yes, please list the name of the – – and he refuses to answer. He respectfully declines to answer the questions on the affidavit except the first three. That's his name, date of birth, and citizenship, Lebanon. What happened two decades of getting the five sticks of dynamite on the – – he's refusing to answer questions that relate to his moral character. At this time, it says now. Are you now? And he refuses to answer. I don't see how it can be other than an abuse of discretion, even if the district court has jurisdiction, not to take that account. Well, Your Honor, this was a – – hearing, Judge Felser. All we submitted, these eight stipulated – – excerpts of record, pages five – – and issue number five – – are not applicants for – – classes enumerated in 8 U.S.C. 24a. The two applicants were there. As we pointed out in our briefs, they had no Fifth Amendment right at the time – – and certainly precluded by – – and the government – – and he had the burden – – natural establishment – – his entitlement to it. Exactly. And to meet it when he refuses to say he is now associated with – – Your Honor, in the original application that Mr. Yacoubian filed, he listed every organization he had belonged to, and if you – – it's in the – – our excerpts of record on the latest appeal. It's tab three. And if you look at that item, you'll see that Mrs. Wilson even asked him questions about that, and he answered them. So, he answered them. The government clearly had a right, if they – – if they thought that he fell into those classes, to call him as a witness themselves, to call anybody else if they had evidence. And they didn't do that. Counsel, while you're looking through your notes there, the government argued in its opening argument that, separate and apart from the conviction, a basis for denying naturalization would be engagement in terrorist activities. There is – Your Honor, there is a statute that was enacted in the early 90s that made engagement in terrorist activities a ground for deportation. It is not a ground for denial of naturalization. Well, what their argument is legally not. My question is this. We – – Felser didn't consider her naturalization hearing the convictions because they were expunged, right? Well, it was brought out in testimony, Your Honor. So, it was before Judge Felser at the hearing. Let me finish my question. I'm sorry. See if it makes any sense. Did the government, at the hearing before Judge Felser, offer any evidence separate and apart from the circumstances surrounding the convictions that these individuals had engaged in terrorist activities? No, Your Honor. Was there any prohibition in your mind to them offering that kind of evidence? No, Your Honor. And as a matter of fact, it – Oh, wait. There was a prohibition on any evidence that would have involved the records of the previous trial involving terrorist activity or anything around it, right? Yeah, well, that – Yeah, but there was no – If they had evidence of terrorist activity – Other than bringing the bomb in the airplane. You mean about this specific case? Yes. Didn't the ceiling order prevent the government from arguing up the facts that lay behind the prior conviction? It could have, but the government never – The court – This is at page 120 – It's 126 of the government's exercise of records in the first appeal. So that issue came up and the court said, well, not having heard the question, it's hard to preclude it. I don't know what question it would be. There might be one or two questions that would be relevant, but I don't know what they are. And so Judge Felser invited at least an offer to see whether or not the court would allow the questions. But, again, there was, through the testimony of Mrs. Wilson and the evidence of their convictions and imprisonment did come before the court. But, you know, the real issue here was the character of the two of them during that – actually, it was seven years by the time that the hearing took place before Judge Felser, who had had this case since November of 1982. And I appeared – we were supposed to be sentenced in 84. There was a probation report. I appeared again in 89 for the sentencing, a large probation report. 98, another probation report. And then November 4, 1999, this hearing where we introduced a number of declarations, made the witnesses available, made the wives available, made the clients available. And all that came out was that Mr. Yakubian was a totally transformed person who was now a moral force in the Armenian-American community. He's the principal of an 800-student school. He has been for 10 years. He's licensed as a therapist after 3,000 hours of training by the state. He's an adjunct professor at Woodbury University. He counsels Armenian immigrants. He keeps a lid on the community. And that was the evidence that was presented to Judge Felser, and it would seem that the INS would want somebody like that. Then why not answer the question that Judge Kleinfeld referred to? I'm sorry, Your Honor. Another question about present affiliations. Exhibit 5. Well, I think there was some question that if they rather than answer a question, what groups did I belong to in the past, you're asking, you're characterizing the groups and asking me did I belong to one that, you know, espoused terrorist thoughts or activities. And I said no. Then you come after me for perjury. I told you in my original application all the organizations I belonged to. I gave you a full answer to that. I answered those under oath. But then I'm, I guess, in the same puzzlement that Judge Hawkins is expressing. If that's true, then the answer is just to say what you've said. I've given you a list which is attached, and I don't know if they fit the definition, but here's the information, and you can judge from that information whether this is a yes or no answer. Well, it was, you know, the other answer is that it was broader than what was relevant. The issue is did you belong to any such organization during the last ten years, and the question was at any time in the past. It was like an old House of American activities question. He also said are you now. Or have you ever been. It was one question. It was one. He refused to answer are you now. But he didn't pose the question, Your Honor. It was posed. And, you know, there's no. He posed the answer. Well, but the point is that he was interviewed on January the 15th, Mr. Yakubian was, answered every single question. And then it wasn't until the end of April that the Immigration Service decided they wanted to come back in again. And, Your Honor, Mr. Yakubian, he made himself available within days of the original request. He was actually interviewed. Counsel, I don't want to beat a dead horse on that with you. Let me bring you back to a technical problem that's still on my mind and hasn't been addressed yet. There's a case called Brock v. Pierce County. In that one, the statute said that the secretary of the relevant agency, Secretary of Labor, quote, shall, close quote, issue a final determination as to misuse of CETA funds by a grant recipient within 120 days of a complaint. We, the Ninth Circuit, had held that the plain meaning of the word shall is that the secretary has to act within 120 days. And if he doesn't, he loses jurisdiction. The Supreme Court reversed. It said, no, the secretary keeps jurisdiction even though the secretary has reached the mandatory 120-day deadline. The holding appears to be this sentence, quote, when, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act, close quote. I'm wondering why that doesn't mean that the panel's decision that jurisdiction remains concurrent wouldn't be correct under Brock. You're right. I believe that was a 1986 case, and that statute did not provide for consequences if there was not activity within 120 days. And the Supreme Court, in the 19 later case, a friend, Christopher River, held that if there's a failure to act, the statute says there's a failure to act within a period of time, and consequences for that, then the agency does lose jurisdiction. I think that's what the defense pointed out here. Thank you. Good morning, Your Honors. I'm here to briefly discuss the impact of INS v. St. Cyr on the facts of this case. The basic presumption in the law is against retroactive legislation because settled experts Here we have a statute that's specifically retroactive. Excuse me, Your Honor. We have a statute that's specifically retroactive. Yes, that's true, Your Honor.  How it should affect preexisting JRATs, and I think that's the issue. What was the quid pro quo? In St. Cyr, there was someone had to make a choice. The individual had to make a choice and perhaps had relied. But where's the reliance here, the specific individual reliance in terms of what your client did differently? Had he had any idea that this retroactive law would be passed? The question that was posed to the client was whether to be sentenced under the Youth Corrections Act or whether to be sentenced as an adult. And the decision was based on the availability of a JRAT for an adult sentence. And I believe that was what the basis for our reliance argument was under St. Cyr. Was a JRAT not available under a youth sentence? Based on my reading of the record, it was not, but I'm not absolutely certain that that was the case. Well, what's the mystery here is that he was not, as I read the record, Hovsepian was not eligible for deportation at the time of the original conviction for his crime of moral turpitude because of the period in which it occurred. And this shows up on the record in 1985 or whenever it was. So why was he getting a JRAT when it wasn't even applicable to him? He couldn't have been deported anyway. There was an argument that it was applicable, Your Honor, as a crime of moral turpitude. And that was the crime of moral turpitude, but it wasn't during the right time period, and the INS lawyer said so at the time. I don't recall seeing that from the record, Your Honor. I do recall that the court and Mr. Hovsepian were of like mind, that he could be deported later for the similar conviction, Your Honor. I'll refer to another conviction. He had a second conviction. The conviction that we were talking about that would fall under the crime of moral turpitude. No, he couldn't have been. At any event, because of St. Cyr, consideration of self-expectations, especially when there is a retroactive application of the law, is now accepted. And, in fact, what has happened here is that the appellees, in this case, had a settled expectation that a JRAT. But this is my problem. Suppose everything you're saying is true. This statute, unlike, as I understand it, you can correct me if I'm wrong, unlike the one that St. Cyr specifically said that the addition, I'm talking now about the statute that added the terrorist provision, specifically said that it applied to past, present, and future situations. Isn't that true? It did say that, Your Honor. All right. So what is it that wasn't determined by the statute? St. Cyr relied on the fact that there was a hole in the statute that didn't directly address the timing question. I believe the hole in St. Cyr was whether there was a suspension of deportation relief available to a conviction that occurred prior to the statute's passage. Right. Because the statute didn't specifically address it. I'm asking you, what about this statute didn't specifically address it? The statute did not specifically address what effect the statute would have on an existing JRAT. What the statute addressed was essentially that you couldn't issue a JRAT for any conviction that had occurred pre, during, or post the statute's passage. And that's the difference. Your time has expired. Thank you, Your Honor. No, I guess it hasn't. Yeah, it has. Thank you. Your Honor, very quickly, Mr. Lightfoot repeatedly said that his client, Mr. Yacoubian, told the INS and the district court every terrorist organization that he had belonged to during the interview. Nowhere during the interview. He said every organization. Yes, and I would say to Your Honors that it is undisputed that these defendants were members of the judicial commandos of Armenian Genocide. That organization, which we have no information as to whether the defendants are still members of because they refused to answer the questions, was nowhere mentioned in the interview, nowhere on the applications, and that's a huge hole that we don't know about these defendants, and that's one reason alone why the district court abused its discretion. Well, what about the fact that you never asked them? I'm sorry? What about the fact that you never asked them during the hearing? Yeah, that's my question, Your Honor. Well, the government, in fact, this is another dispute I have with Mr. Lightfoot. He says that the government never attempted to introduce or elicit in any way information about these terrorist organizations. The government did. The government tried to submit reports from the State Department that addressed these organizations, both the ones that the defendants had said they belonged to in their application and ones that the government had reason to believe that they had belonged to. The defendants objected, and the district court sustained the objection. Did these two individuals testify? No, not to my knowledge. I don't believe they did, Your Honor. Do you have a record sign on the rejection of that evidence? I do. He can provide it later. He can provide it, Your Honor. Very quickly, the point that Judge Kleinfeld made about the Sazizi case, it's clearly to the alien's benefit to have concurrent jurisdiction so that they get a resolution to their application as quickly as possible. It's clearly what Congress intended. This court, en banc in the Gorbach v. Reno case, recognized the strong preference that Congress has for INS to make these resolutions, not the district court. In this case, for instance, the district court failed to act on the naturalization applications for six months after the defendants filed their petition. If INS didn't have jurisdiction in a typical case, what's to prevent a district court from failing to act on the application forever? It's to the alien's benefit, as it was in Sazizi, for both entities to have concurrent jurisdiction. Mr. Lightfoot referred to the INS's ability to get a waiver of 120 days. That waiver provision in the INS's regulation applies only to those who fail the English language or the history provision. Counsel. See, I'm out of time. Thank you, Your Honor. Thank you. The case just argued is submitted for decision. That concludes the court's calendar for this morning. The court stands adjourned. If you want to say anything, would you please skip to the next one? You can skip to the next one.
judges: Schroeder, Dw Nelson, Kleinfeld, Hawkins, Thomas, Graber, McKeown, Gould, Paez, Berzon, Clifton